Peter Bonis, SBN 203783
LAW OFFICES OF PETER BONIS
1990 California Street, 8th Floor
Walnut Creek, California 94596
Telephone: (925) 287-6428
Fax: (877) 391-9634
peter@bonislaw.com
Email: peter@bonislaw.com

Attorneys for Plaintiff
GEORGE MARCUS

**UNITED STATES DISTRICT COURT**
**IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA**

GEORGE MARCUS,

Plaintiff,

v.

CITY OF RICHMOND; CHRISTOPHER MAGNUS; KAISER PERMANENTE MEDICAL CENTER, DR. BILHARTZ, DR BROWN, DR. DISTON, DAVID NEWDORF, ESQ, DOES 1-100.

Defendants.

**Case No. 3:16-CV-02871-MMC**

**FIRST AMENDED COMPLAINT FOR DAMAGES, EQUITABLE AND/OR INJUNCTIVE RELIEF**

1. VIOLATIONS OF THE FEDERAL CIVIL RIGHTS ACT, 42 U.S.C. § 1983;
2. VIOLATIONS OF CALIFORNIA LABOR CODE § 1102.5, 6310
3. VIOLATIONS OF CALIFORNIA LABOR CODE SECTION 6310
4. MEDICAL MALPRACTICE
5. PROFESSIONAL MALPRACTICE
6. BREACH OF FIDUCIARY DUTY

Plaintiff George Marcus complains and alleges as follows:

## I. PARTIES AND JURISDICTION

1. Plaintiff George Marcus ("Plaintiff" or "Marcus") is, and at all relevant times hereto, has been a resident of the State of California.

2. Plaintiff was a Police Officer with the City of Richmond, Richmond Police Department.

Plaintiff had an outstanding employment record with the Richmond Police Department, and he has received consistent praise for his performance as a Police Officer. Plaintiff completed his probationary period, and, as a result, has a vested property interest in their continued public employment as a peace officer.

3. Plaintiff is informed and believes and thereby alleges that Defendant City of Richmond (hereinafter "City" or "Defendant"), is and at all relevant times hereto, was a public entity that operated in the State of California, County of Contra Costa.

4. Defendant City of Richmond, including its departments, units, and/or political subdivisions, is and at all relevant times hereto, was an employer operating as a public entity within the State of California, County of Contra Costa, who regularly employed more than 15 persons.

5. Defendant City of Richmond is a city municipality located within the State of California and doing business as a government entity under color of state authority and law.

6. Defendant Christopher ("Defendant Magnus") is an individual who is a managerial or supervisory employee of Defendant City of Richmond. For purposes of the federal civil rights cause of action, Defendant Magnus is being sued in his individual and/or official capacity.

7. Defendant Kaiser Permanente is a Health Maintenance Organization which does business in the State of California.

8. Defendant Patty Bilhartz is a physician who is employed by Kaiser Permanante in Vacaville.

9. Defendant Brown is a physician who is employed by Kaiser Permanante in Vallejo.

10. This Court has jurisdiction and venue over this action in that Defendants employed Plaintiff within this judicial district in the State of California. This Court has supplemental jurisdiction over the state law claims, in that they arose from the same common nucleus of operative facts, as the federal claims.

11. Plaintiff is unaware of the true identity, nature and capacity of each of the defendants designated herein as a DOE, whether individual, corporate, associate or otherwise, who therefore

sue such defendants by fictitious names pursuant to California Code of Civil Procedure §474. Plaintiff is informed and believe and thereby allege that each of the defendants designated herein as a DOE is in some manner responsible for the damages and injuries as are alleged in this Complaint. Upon learning the true identity, nature and capacity of the DOE defendants, Plaintiff will amend this Complaint to allege their true names and capacities.

12. Plaintiff has timely exhausted all administrative remedies prior to filing this complaint.

13. Unless otherwise indicated as acting in individual capacity, Plaintiff is informed and believes and thereby alleges that each of the defendants herein were at all times relevant hereto, the agents, representatives, servants and employees of the remaining defendants, and were acting at least in part within the course and scope of such relationship, and that the wrongful acts alleged herein were committed by such defendants, and each of them.

## **FACTUAL BACKGROUND**

14. Plaintiff realleges and reincorporates by reference the preceding paragraphs as though fully set forth herein.

15. On July 2, 2013, plaintiff George Marcus was working a traffic assignment at Gate 14 of the Chevron refinery located in Richmond, California.

16. At approximately 7:00 p.m., Officer Marcus stopped a car at the intersection of Castro Blvd and Interstate 580 for violating Vehicle Code Section 22526(a), which prohibits and automobile from entering an intersection if there is not sufficient space for the car to get through the intersection. The purpose of this code section is to prevent gridlock.

17. The driver of the vehicle was Vilma Romero De Gonzalez. Officer Marcus, who was wearing a police uniform and driving a marked police vehicle, approached the car and asked Ms. Gonzalez for her driver's license and registration.

18. Ms. Gonzalez refused. Officer Marcus gave her a numerous chances to avoid being arrested for several misdemeanor violations). Again, Ms. Gonzalez refused.

19. Officer Marcus then informed Ms. Gonzalez that she was under arrest. Ms. Gonzalez fought/obstructed violently as Officer Marcus attempted to take her into custody fighting with

Officer Marcus, moving over to the passenger side of the car, and then, when he tried to remove her, punching him in the face. Officer Marcus opened up the passenger side door, pulled Ms. Gonzalez out of the car and began trying to handcuff Ms. Gonzalez. Officer Marcus was able to overcome Ms. Gonzalez, and guided Ms. Gonzalez per Richmond Police Department guidelines to the ground where he was finally able to subdue and handcuff Ms. Gonzalez.

20. During this struggle Officer Marcus sustained severe injuries to both of his shoulders which ultimately made it impossible to continue his career as a police officer.

21. As a result of his injuries, On July 2, 2013 Officer Marcus was taken to the emergency room of the Kaiser Permanente medical facility in Richmond)

22. This occurred on July 2, 2013. He went to the Kaiser Richmond Emergency Room.

23. The doctor diagnosed a sprain and put Officer Marcus on light duty.

24. On July 3, 2015, plaintiff returned o Kaiser Permanente because he was in extreme pain and could not move his left arm.

25. At that time, defendant Dr. Patty Bilhartz told him he had probably sprained his shoulder. She refused to prescribe any painkillers.

26. Plaintiff asked for an MRI. Dr. Bilhartz refused, instead recommending physical therapy. After a heated argument with plaintiff about the necessity of an MRI, she finally capitulated and ordered an MRI.

27. On July 12, 2013 Plaintiff was given a light duty memorandum requiring he work normal duty hours.

28. On July 19, 2013 Plaintiff had a second appointment with Dr. Bilhartz. He was in extreme pain, and could not sleep or move his left arm. Plaintiff told Dr. Bilhartz about his condition, asked that he be taken off work and be given pan medication.

29. Dr. Bilhartz responded she would not give prescribe pain medication and plaintiff should return to work. When asked the reason for her decision, Dr. Bilhartz said “ It would just be better.” No explanation was provided.

30. On July 26, 2013, Plaintiff met with Kaiser orthopedist Dr. Yee. Dr. Yee gave plaintiff a

list of shoulder exercises and referred him to Dr. Diston for shoulder surgery.

31. On the same day, Plaintiff saw Dr. Bilhartz again. He was still in severe pain, and unable to use his left shoulder. Dr. Bilhartz again refused to prescribe any pain medication

32. Dr. Bilhartz also told Marcus the MRI revealed that plaintiff had a tear in his left shoulder.

33. Dr. Bilhartz said surgery was contraindicated, and that Plaintiff should instead try non-invasive methods of healing. Her first action was to give him a cortisone shot in his shoulder.

34. Dr. Bilhartz represented that the shot would be painless and give plaintiff relief from the pain. It would not hurt and would make it feel better.

35. At this time, rather bizarrely, Dr. Bilhartz said "Let us pray", placed the palms of her hands together, and began to mumble under other her breath.

36. She then started to give plaintiff the shot. The pain was excruciating.

37. Plaintiff's wife had accompanied him to the appointment and was present in the exam room when Doctor Bilhartz administered the shot. It was obvious to any observer that Plaintiff was in extreme pain. Plaintiff's wife told the doctor that it was obvious from the behavior of plaintiff, who was cringing away from the needle, panting and gasping, that plaintiff was in extreme pain. Plaintiff again stated that he was in extreme pain.

38. Again, Dr. Bilhartz responded "No you are not". Bilhartz was mumbling and saying under her breath, "It doesn't hurt" over and over again.

39. Plaintiff by now believed that Bilhartz had serious mental issues.

40. He again told her that he was suffering from the pain and needed to be taken off work since he could not sleep or do anything else.

41. Again, Bilhartz refused to take plaintiff off work or give plaintiff any pain medication. She stated that plaintiff would be better off if he went to work.

42. By this point, completely fed up, Plaintiff told Dr. Bilhartz he was just going to have another other doctor prescribe pain medication. Bilhartz said that this would be best.

43. Based on Bilhartz' s erratic behavior Plaintiff knew he was not going to get the quality of

care he needed. He then called and spoke to a clerk at the Vacaville Kaiser Work Comp. Admin requesting a new doctor.

44. On July 30, 2013 Plaintiff called Kaiser and spoke to a female identifying herself as Carol Hodges, Kaiser Vacaville Work Comp Manager.

45. Plaintiff explained to Hodges the concerns he had about his care.

46. Hodges immediately became angry and started yelling at Plaintiff, telling him he was only looking for a "Work slip".

47. Plaintiff then asked her if she had heard anything he had told her about his concerns regarding his care, and she told him again that “Was only looking for a work slip and that she would not change his doctor”.

48. Plaintiff said he was not asking her but telling her that she was going to change his doctor or that he was going to speak to her supervisor and that she had until the end of the day to call plaintiff with the name of his new doctor. He then hung up.

49. She later called Plaintiff with a new doctor Samuel Brown.

50. On August 1, 2013 Plaintiff had his first visit with Doctor Brown. Doctor Brown took him off work for two weeks, gave him a prescription for painkillers, and referred him to a surgeon.

51. On August 8, 2013, Plaintiff met with Dr. Brown a second time. During the visit Doctor Brown became extremely agitated and told plaintiff that the City of Richmond Insurance Company wanted to know when he would be sent back to work. Plaintiff was still off work.

52. On August 15, 2013 and September 5, 2013, plaintiff was still not cleared to return to work. During both appointments Dr. Brown told plaintiff that the City of Richmond was pressing him for when plaintiff could return to work.

53. On September 12, 2013 Plaintiff had shoulder surgery.

54. Although it was not discovered until substantially later, the surgery was improperly performed which ultimately resulted in the necessity of additional surgery to correct the mistakes made during the initial surgery.

55. For every visit for the next two months, Doctor Brown told plaintiff that the City of Richmond was still inquiring as to when he would be back to work.

56. Plaintiff finally was allowed physical therapy after almost two months after the operation. When he inquired as to the delay, Plaintiff was told that someone had lost the physical therapy slip.

57. On November 20, 2013, plaintiff had a visit with the surgeon, Dr. Diston. Diston told plaintiff that he should be a lot further in his recovery post surgery, as well as that he did not have the range of motion that a successful surgery should have provided.

58. Plaintiff was as still in severe pain and was still taking pain medication as recommended by Brown.

59. During a December 5, 2013 appointment, Plaintiff again told Dr. Diston he was not doing well in physical therapy, was still in pain and could not sleep.

60. Dr. Brown told plaintiff that it would take up to a year for full recovery

61. At the next visit on January 2, 2014, Dr. Brown entered the exam room in an extremely agitated state, exhibiting a completely changed attitude towards the plaintiff and his wife. Plaintiff again told Dr. Brown he was still having pain and that the physical therapist did not believe he was getting better and believed there was some other issue based on the symptoms he'd observed. Dr. Brown immediately snapped at plaintiff saying "What do they know, they are just physical therapists".

62. Plaintiff and his wife told Dr. Brown that they thought plaintiff needed a post surgery MRI. Dr. Brown said no. Plaintiff and his wife both pointed out that at his last office visit Brown had said he would order the MRI.

63. At this point Dr. Brown raised his head, looked at plaintiff's wife, raised his voice and said, "No I did not". This conversation was repeated.

64. Plaintiff asked Dr. Brown when he was going to focus on his right shoulder. Dr. Brown seemed surprised and then said, "That's right, your right shoulder was injured". Plaintiff then lifted his right arm up and rotated back. His right shoulder made a popping noise and jerked

back, coming out of its joint. Dr. Brown immediately said, "Then don't do that".

65. Without being prompted, Dr. Brown told Plaintiff that plaintiff had been off work long enough, and, raising his voice said he was immediately sending him back to work on modified duty.

66. Plaintiff, had no objection to returning to work but needed to be on pain medications due to his still being in constant pain. Dr. Brown did not put the pain medicine prescription on the modification slip. Plaintiff is informed and believes that this was to avoid showing that plaintiff was taking pain medications so that he could be ordered back to work.

67. Immediately after this appointment Richmond Lieutenant Lori Curran called Plaintiff, told him where to report, and what modified duties were.

68. This stunned plaintiff. He could not figure out how the Department became aware so quickly that he was returning to work.

69. Plaintiff told Curran that he was still under the influence of narcotic pain medication. Curran told him "It did not matter" if the doctor was placing plaintiff on modified duty there was nothing stopping him from working while taking the prescribed narcotics. Plaintiff was extremely concerned at this point because he would be required to wear his gun while on duty.

70. Officer Curran then callously told Plaintiff that he did not have to take his pain medication while at work he could take it when he got home.

71. When Plaintiff came to work he was ordered by his direct unit supervisor Sgt. Schlemmer to stay at his assigned office desk to finish traffic collision investigation and forensic drawings. He was told this was an order given to Sgt. Schlemmer from his unit Lieutenant Carmichael. During his time on modified duty Lt. Carmichael requested Plaintiff help his traffic unit by offering his accident reconstruction expertise.

72. Plaintiff was called to a double fatal traffic collision to direct the investigation of the accident. While out at the scene Sgt. Schlemmer wanted to know what Plaintiff was doing there. Plaintiff told him he was ordered to come out and help.

73. Sgt. Schlemmer appeared not to be happy and told Plaintiff Lt. Carmichael should not

have him out at the scene.

74. The next day Lt. Curran asked Plaintiff why he was at the scene telling him that Sgt. Schlemmer told her Plaintiff was out at the scene. Plaintiff told her. She told Plaintiff he was on modified duty and was not supposed to be out of the building. This was contrary to her previously issued light duty assignment saying Plaintiff could be out as long as the commander knew or on official city business.

75. Plaintiff continued to work from his assigned desk to conduct follow ups and finish his reports. Every single day Sgt. Schlemmer would ask Plaintiff if he was finished so he could go to records and sit at one of the records clerks' desk.

76. Plaintiff asked why he could not sit at his own desk and answer phones and do reports, since it was 50 feet from the records office.

77. Sgt Schlemmer told him it was because he needed to sit in records. When Plaintiff asked why other investigators who were working on the second floor got to stay at their desks while on light duty, Schlemmer became extremely angry, telling plaintiff that was what he(Schlemmer) wanted.

78. Plaintiffs work schedule was also changed without notice. Plaintiff now had to work 5 days a week instead of 4 days a week. It is plaintiff's perception this was done to make his situation more difficult as punishment.

79. In January of 2014, Plaintiff obtained a new physician, Dr. Dillingham.

80. In January of 2014, Deputy Chief Medina, sent two letters, one was to Dr. Dillingham, the other to Dr. Seslor, Plaintiff's foot doctor . They contained identical language. Neither Doctor requested letters from Deputy Chief Medina.

81. In the same month (January 2014) Sgt. Mike Rood walked by plaintiff in the hallway, next to the stair doors for the second floor and asked Plaintiff how his shoulders were. He then said to Plaintiff, "I heard you have a knee injury now?" as if suggesting Plaintiff had made up a knee injury.

82. Plaintiff was concerned because Officer Rood had no reason to know about plaintiff's

knee. This knee injury was reported prior to plaintiff's shoulder injuries, when his work motorcycle fell on him.

83. This was a violation of HIPAA and various other statutes. The only individuals who should have had information that Plaintiff was having knee issues were Lt. Curran, his immediate supervisor Sgt Schlemmer, and Plaintiff's doctor.

84. Also, in January of 2014, Plaintiff was asked by Deputy Chief E. Medina to report to the City Council Building located at 450 Civic Center, Richmond to speak to City Council about parking problems. At the time Plaintiff was under the influence of Percocet to ease his shoulder pain.

85. Plaintiff told Lieutenant Whitney and Threats he was under the influence of narcotics. He was concerned because he was being forced to drive his personal vehicle to the City Council meeting while under the influence of narcotics and carrying a gun. .

86. Lt. Whitney appeared horrified and told Plaintiff that this conduct could create serious liability for the City of Richmond and asked Plaintiff if anyone else knew about the conditions surrounding the request.

87. Plaintiff told Lt. Whitney he had told Lt. Curran and Lt Curran told him there was nothing in the City of Richmond Police Department manual forbidding it.

88. Lt. Whitney told Plaintiff there was, but then told plaintiff not to worry about it. Lt. Whitney then told Plaintiff he did not want to hear anything else from plaintiff, nor did he want to be a part of it. Plaintiff drove himself to 450 Civic Center Drive, obeying a direct order from Deputy Chief Medina and while under the influence of a narcotic.

89. On February 12, 2014 Plaintiff finally received an appointment to see his new shoulder doctor, Dr. Dillingham at the S.O.R.E. group. It took over two months of battling with the City of Richmond's work compensation carrier.

90. Plaintiff was again released to restricted duty on February 14, 2015.On the release form Dr. Dillingham wrote "Plaintiff was under the influence of Percocet (Narcotic) and that it would affect his work ability." Plaintiff told Lt. Curran about this who told him it did not matter and

that he was ordered to work.

91. While on modified duty Plaintiff was continually harassed by Sgt. Schlemmer. Even though Plaintiff was asked by Lt. Carmichael to do certain tasks, Sgt. Schlemmer continued to come to Plaintiff desk and tell Plaintiff he was supposed to be in the records division. Plaintiff told Sgt. Schlemmer he had been ordered to do so by. Carmichael, but Schlemmer acted as though the chain of command didn't exist.

92. So Plaintiff began going back and forth from his desk to the records division desk. At times he needed to get things from his computer, or rest at his desk (per the orders of Chief Deputy Medina) out of the sight of the public in the records division. One day he was sitting at his desk, resting because he did not feel well. Sgt. Schlemmer came to Plaintiff and informed him loudly "You are supposed to be in records".

93. Plaintiff told Sgt. Schlemmer he was resting. Schlemmer got angry and stormed off. Five minutes later Plaintiff was ordered to report to Lt. Curran's office on the second floor. Plaintiff met with both Lt. Curran and Sgt. Schlemmer. Lt. Curran asked Plaintiff why he was not following Sgt. Schlemmer orders. Plaintiff said he was but that he needed to rest from time to time.

94. Lt. Curran told Plaintiff he was on modified duty in the records unit and that is where he was supposed to be. Plaintiff told her that he was at his desk resting because he did not feel good. She told Plaintiff he could not rest at his desk.

95. Plaintiff replied that Deputy Chief Medina said he could rest any time he needed to, giving her a copy of Deputy Chief Medina's work restriction form and pointing to the highlighted language stating "Free access to sit/stand/rest as frequently as needed". Lt. Curran had previously received a copy of the work restriction form.

96. Lt. Curran read the work restrictions and told Plaintiff his interpretation was not the same as Deputy Chief Medina's interpretation.

97. Plaintiff responded, pointing out that the language was in black and white and the Chief's orders superseded Curran and Sgt. Schlemmer, these orders were in writing and he was going to

follow them. Plaintiff said he did not feel well and he was still under the influence of narcotics. Lt. Curran told Plaintiff he was being insubordinate. Simultaneously, Sgt. Schlemmer was yelling at Plaintiff. At one point Lt. Curran told Sgt. Schlemmer to calm down and be quiet. . Plaintiff pointed out he was following Deputy Chief Medina's orders. Plaintiff then left the office.

98. A few weeks later Plaintiff was again taken off work by Dr. Dillingham for surgery on both shoulders. Dr. Dillingham told plaintiff his left shoulder surgery was a disaster, that the anchor and stitches had torn loose, that they were bleeding and that plaintiff was and had serious and widespread damage to his left shoulder.

99. Meanwhile, Vilma Romero De Gonzalez and her mother Ana Vilma Vides Romero,(who was also a passenger in the car), decided to sue the City of Richmond and plaintiff in Federal Court for the Northern District for damages allegedly incurred during the stop and arrest.

100. The Contra Costa District Attorney's office filed charges against DeGonzalez for resisting arrest with violence and causing severe injury to a peace officer), California Penal Code Violation 69, a felony, violation of Penal Code Section 148.7, resisting arrest, a misdemeanor, and violation of Vehicle Code Section 2800. The Federal case was captioned Vilma Romero De Gonzalez and Ana Vilma Vides Romero v City of Richmond.

101. The City of Richmond, instead of being good stewards of taxpayer money, decided to pay the Romero's a settlement in the amount of $55,000.

102. Between the time that the City of Richmond made the decision to settle, and the date of the settlement conference, Ms. Romero was convicted of committing the charged crimes against Officer Marcus in Contra Costa County. This eliminated the case against the City.

103. The City of Richmond was represented in this action by Bryan Newdorf, of the Newdorf Law Group. Mr. Newdorf, in a clear conflict of interest was also representing George Marcus without a written waiver.

104. On April 23, 2015, Mr. Bonis, current counsel for plaintiff, contacted Mr. Newdorf,

informed him that the Romero's had been convicted, that Mr. Marcus intended to pursue legal action against Ms. Gonzalez, and that there was a conflict of interest.

105. Mr. Newdorf acknowledged the message and requested that any further conversations take place between Mr. Bonis and himself, and not involve Mr. Marcus.

106. On or about May 1, 2015, there was a settlement conference at the Federal District Court in Northern California. Mr. Marcus was not notified of the settlement conference.

107. Apparently after a settlement deal had been worked out between the City and the Romero's, they now needed Officer Marcus to approve the settlement and give up his rights against the Romeros..

108. At approximately 10:00 a.m. Officer Marcus was called and rudely told by the settlement judge that he needed to appear in Federal Court in San Francisco, immediately. This was at least a one hour trip away from his residence.

109. At that time Plaintiff learned that that Newdorf had "negotiated" a settlement deal whereby the City of Richmond would pay money to the Romero's in exchange for Mr. Marcus giving up his claims against the City.

110. Plaintiff had never been advised the Newdorf was setting up a settlement in which he was going to be required to relinquish his rights against the Romeros.

111. After a great deal of abuse and invective from the settlement judge, as well as advice from Newdorf that the settlement was a "good deal" for Officer Marcus, further invective by the judge to the effect of "this is a good settlement and you need to take it", while attorney David Poore was on the phone and with Newdorf, Chief Deputy Brown, City attorney, the Romero's and I were on the phone) threats of jail and sanctions, Mr. Marcus was forced to involuntarily relinquish his claims against the Romeros.

**FIRST CAUSE OF ACTION**
**(Violations First and Fourteenth Amendment, 42 U.S.C. Section 1983 – City of Richmond )**

112. Plaintiff incorporate herein by reference all of the allegations contained in paragraphs 1

through 26 of this Complaint as fully set forth herein.

113. At all times herein mentioned, plaintiff George Marcus had a protected property interest in his continued employment as a police officer.

114. In acting above, Defendants violated Plaintiff's substantive and procedural due process, privacy rights, and petition rights under the First and Fourteenth Amendments to the United States Constitution, and, acting under color of authority, further violated Plaintiff's rights under 42 U.S.C. Section 1983.

115. Defendants violated Plaintiff's due process rights, in that Defendants targeted Plaintiff' employment as peace Officer, interfered with their medical treatment and care, thereby constructively terminating their employment, without any hearings or opportunity to be heard, and black-balling them from any future employment as a police officer. Defendants violated Plaintiff's procedural and substantive due process rights.

116. Specifically, defendants told plaintiff's doctors to order him back to work regardless of whether he was fit for work. In doing so, defendants violated plaintiffs HIPAA rights by obtaining confidential medical information and revealing it to police department personnel who should not lawfully have this information.

117. Defendant the City of Richmond also ordered plaintiff to not take his pain medication (although if plaintiff did not take his pain medication he could not function) and to report to work, in effect ordering him to drive under the influence of narcotics while carrying a weapon.

118. In addition, on several occasions, knowing that plaintiff was under the influence of pain medication, plaintiff was ordered to drive to various locations in the City of Richmond, both in his personal vehicle and in an official vehicle, while under the influence of legally prescribed narcotics.

119. Furthermore, as stated above, when plaintiff pointed out that requiring him to drive under the influence of narcotics and while carrying a handgun was not safe for himself or the public defendants retaliated against him by denying him a place to rest while at work, and criticizing him extensively both in writing and orally.

120. Plaintiff is informed and believes that they also harassed him by directly and indirectly by assigning him tasks designed to be difficult for him to complete with his injuries and then criticizing him for not satisfactorily completing those tasks.

121. Defendants denied defendant his first amended rights by affording him no right to a hearing on these issues, specifically issues related to his ability to perform light duties while in severe pain.

122. Defendants further interfered with plaintiffs recovery by instructing plaintiff's doctors to order him back to work regardless of his physical condition. On one occasion, defendants contacted plaintiffs physician prior to plaintiffs medical appointment and told the Doctor that they wanted plaintiff ordered back to work

123. Defendants violated Plaintiff's First Amendment rights, in that Defendants retaliated against Plaintiff for making complaints of public concern to Defendants, and targeted Plaintiff's employment with adverse actions.

124. Defendants have a history of retaliating against any officer who criticizes the department's practices regarding protected issues.

125. These include adverse employment actions against Officers Shawn Pickett and Arnold Threets for complaining about racial mistreatment by senior officers.

126. Plaintiff is informed and believes that adverse employment actions were also taking against other Officers including Cleveland Brown, Steve Harris, Andre Hill for making complaints about racial prejudice and unsafe actions by the police department.

127. Plaintiff is informed and believes that defendants also took adverse employment action against John Wycinski, and several other officers, whose names are unknown to plaintiff for complaining about the Department practice of forcing officers to report to work when injured such that the could not work, directly interfering with the medical treatment the officers were receiving by unlawfully contacting their doctors and instructing the physicians to order the officers back to work regardless of whether they were fit to do so, and forcing the officers to drive and carry guns while under the influence of prescribed narcotics.

128. There is no due process hearing on these issues available to officers who are treated this way, they are not afforded any protections by the City of Richmond.

129. Plaintiff is informed and believes that Defendant City of Richmond has a custom, policy, pattern, or practice of retaliating against employees who make complaints of public concern.

130. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered loss of employment, indignity, great humiliation and emotional distress manifesting in physical symptoms.

131. Defendants also give plaintiffs unsupported negative performance evaluations which are then entered into plaintiffs personnel files which impact their promotional opportunities within the department as well as making them unemployable should they seek employment elsewhere.

132. Defendants' actions have caused and continue to cause Plaintiff substantial losses in earnings, significant reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

133. As to individual Defendant Magnus only, the acts of these said defendants as alleged herein, were intentional, oppressive, fraudulent, and done with ill will and intent to injure Plaintiff and to cause Plaintiff mental anguish, anxiety, and distress. The defendants' acts were done in conscious disregard of the risk of severe emotional harm to Plaintiff and with the intent to injure Plaintiff, constituting oppression, fraud, malice under California Civil Code §3294, entitling Plaintiff to punitive damages against these defendants only.

## <u>SECOND CAUSE OF ACTION</u>

**(Violations of California Labor Code Section 1102.5 – Defendant City of Richmond Only)**

134. Plaintiff realleges and incorporates by reference Paragraphs 1 through 34 of this Complaint as though fully set forth herein.

135. Plaintiff was subjected to an adverse employment action as a result of his complaints about being forced to come to and work while under the influence of narcotics.

136. Specifically, he was given bad performance reviews, harassed verbally by his supervisors, and ultimately forced out of his position as a police officer because the situation became intolerable, particularly so since the City kept ordering him back to work even though he had not fully healed.

137. California Labor Code Section 1102.5 et seq provide that it is an unlawful employment practice for an employer to retaliate against an employee who makes complaints to public entities.

138. Defendant City of Richmond violated Section 1102.5 with regard to Plaintiffs when it targeted Plaintiff's employment with retaliatory conduct, which caused the constructive termination of their employment.

139. Defendants' conduct toward Plaintiff as alleged above, constitutes an unlawful employment practice in violation of Section 1102.5.

140. As a direct and proximate result of Defendant's conduct, Plaintiffs have suffered loss of employment, indignity, great humiliation and emotional distress manifesting in physical symptoms.

141. Defendant's actions have caused and continue to cause Plaintiffs substantial losses in earnings, significant reputation and professional injury, loss of promotional opportunities and other employment benefits, lost wages, attorneys' fees, medical expenses, future earnings and benefits, cost of suit, humiliation, embarrassment and anguish, all to their damage in an amount according to proof.

## THIRD CAUSE OF ACTION

**(Violations of California Labor Code Section 6310 – Retaliation – Defendant City of Richmond Only)**

142. Plaintiff realleges and incorporates by reference Paragraphs 1 through 40 of this Complaint as though fully set forth herein.

143. California Labor Code Section 6310 provide that it is an unlawful employment practice for an employer to retaliate against an employee who makes a bona fide complaint of safety in the workplace..

144. Defendant City of Richmond violated Section 6310 with regard to Plaintiff when it engaged in adverse employment actions in retaliation for making several internal complaints to Defendants about safety in the workplace, including the use of dangerous narcotics medications by peace Officer in the workplace.

145. Plaintiff suffered while working on duty. His condition was then aggravated not by working while on duty, but being forced to choose between being in pain or being anesthetized. He further suffered injury because the defendants interfered with his treatment and ordered him back to work.

146. Defendants' conduct toward Plaintiff as alleged above, constitutes an unlawful employment practice in violation of Section 6310.

147. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff has suffered damages in an amount to be proven at trial, including any equitable or injunctive relief.

## FOURTH CAUSE OF ACTION
**(Professional Negligence Against Kaiser Permanante, Dr. Dillingham, Dr. Bilhartz and Dr. Brown)**

148. Plaintiff realleges and reincorporates by reference the preceding paragraphs as though fully set forth herein.

149. The above named defendants owed plaintiff a duty of care.

150. The duty of care defendants owed plaintiffs was the duty of a physician to use the use the level of skill, knowledge, and care in diagnosis and treatment that other reasonably careful physicians would use in the same or similar circumstances.

151. Defendants breached this standard of care by failing to properly diagnose, and treat plaintiffs injuries, specifically his shoulders.

152. As a result of defendants breach of duty plaintiff suffered damages in an amount according to proof.

## FIFTH CAUSE OF ACTION
**(PROFESSIONAL MALPRACTICE)**
**(Against Newdorf Only)**

153. Plaintiff realleges and reincorporates by reference the preceding paragraphs as though fully set forth herein.

154. Defendant Newdorf is an attorney licensed to practice law in the State of California since 1994,

134, As such, defendant Newdorf owed plaintiff a duty to use the same duty of care that would be used by a reasonably prudent attorney in the same or similar circumstances.

155. Defendant breached this duty by taking on representation in which there was a clear conflict of interest, in that the interests of one client (the City of Richmond) were directly opposite to the interests of his other client, Plaintiff Marcus.

156. Defendant further breached this duty by failing to advise Marcus of the conflict, and by then advising him that the "had to "accept a settlement in which he gave up a valid and collectible claim against the Romeros.

157. As a result of defendant Newdorf' s conduct, plaintiff lost a against the Romeros which would have compensated him for his injuries.

158. The claim would have been collectible because the Romero's owned real property and the junior Ms. Romero was employed by the United States Post office, thereby giving her an attachable income stream.

159. Wherefore plaintiff suffered damages in an amount according to proof.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(Against Defendant Newdorf)**

160. Plaintiff realleges and reincorporate by reference the preceding paragraphs as though fully set forth herein.

161. As counsel for plaintiff, as a matter of law defendant Newdorf owed plaintiff a fiduciary duty.

162. Defendant breached that duty by taking representation with a conflict of interest, failing

to disclose the conflict of interest, failing to adequately advise the plaintiff of the conflict of interest, putting his own financial interest ahead of Plaintiff (his desire to keep the City of Richmond as a client) and advising Marcus to accept a deal that was clearly not in his best interests.

163. As a result of the defendants breach of fiduciary duty, plaintiff suffered damages in an amount according to proof.

164. Defendants actions were taken with fraud, malice and oppression, such that an award of punitive damages is justified.

CONTINUED ON THE NEXT PAGE

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for judgment against Defendants, and each of them as follows:

1. For general damages in an amount according to proof;
2. For special damages in an amount according to proof;
3. For prejudgment interest in an amount according to proof;
4. For punitive damages in an amount according to proof;
5. For equitable and/or injunctive relief;
6. For statutory penalties, if applicable;
7. For reasonable attorney's fees and cost of suit therein;
8. For such other and further relief as the court may deem proper.
9. Plaintiff demands a trial by jury.

Dated: August 5, 2016 LAW OFFICES OF PETER BONIS

By: /s/

Peter Bonis
Attorneys for Plaintiffs